FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

JAN 14 2011

JAMES N. HATTEN, CLERK
By: _____ Deputy Clerk

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of INTEGRITY BANK of Alpharetta, Georgia, <br><br> Plaintiff, <br><br> v. <br><br> STEVEN M. SKOW, ALAN K. ARNOLD, DOUGLAS G. BALLARD, CLINTON M. DAY, JOSEPH J. ERNEST, DONALD C. HARTSFIELD, JACK S. MURPHY, and GERALD O. REYNOLDS, <br><br> Defendants. | ( <br> ( <br> ( <br> ( <br> ( <br> ( <br> ( <br> ( <br> ( <br> ( <br> ( <br> ( <br> ( <br> ( <br> ( <br> ( <br> ( |

Civil Action File
No.: 1:11-CV-0111

JEC

## **COMPLAINT**

Plaintiff, the Federal Deposit Insurance Corporation, as Receiver of Integrity Bank of Alpharetta, Georgia ("FDIC"), for its Complaint states as follows:

The FDIC brings this lawsuit in its capacity as Receiver of Integrity Bank of Alpharetta, Georgia ("Integrity" or "Bank"), to recover over $70 million in losses the Bank suffered on twenty-one (21) commercial and residential acquisition, development and construction loans approved by the Defendants between February 4, 2005 and May 2, 2007 ( "Loss Loans"). The approval of the Loss Loans as well

as numerous other acts of negligence, gross negligence, and/or breaches of fiduciary duties and/or other legal duties by the Defendants were the direct and proximate cause of the Bank's losses.

### Preliminary Statement

Integrity was a Georgia state-chartered, non-member bank founded in November 2000. The Bank was headquartered in Alpharetta, Georgia and also had branches in Roswell, Smyrna, Duluth, and Cumming, Georgia. Integrity was a wholly owned subsidiary of Integrity Bancshares, Inc. ("Bancshares"), a single-bank holding company whose stock was officially listed on the NASDAQ Global Market in September 2006.

The Defendants are eight former directors and officers of the Bank. The Defendants were also members of the Bank's Director Loan Committee ("DLC"), a committee Integrity's Loan Policy "charged with maintaining responsibility for the overall credit function." From inception, the Defendants caused the Bank to pursue an unsustainable growth strategy designed to exploit the then-expanding "bubble" in the residential and commercial real estate market. In order to facilitate rapid growth, the Bank concentrated its lending in higher risk, speculative commercial and residential acquisition, development and construction ("ADC") loans in the Atlanta metropolitan area and some out-of-territory markets in South

2

Carolina and Florida. These type of loans were further concentrated in a small number of preferred individual borrowers to an extent that exceeded Loan Policy and Georgia statutory lending limits. The Defendants increased the Bank's already high risk exposure by implementing policies and procedures void of the most basic prudent lending controls and neglecting to adequately supervise lending personnel.

State and federal regulators repeatedly warned the Defendants of the increasing risks associated with the Bank's excessive growth rate, heavily concentrated loan portfolio and lax oversight and control of the lending function. The Defendants had actual notice of these risks and a growing awareness of adverse changes in the real estate market but made little or no effort to diversify the Bank's real estate portfolio, enhance oversight of the lending function or otherwise mitigate the increased risk they created by following a growth-at-all-cost strategy. Instead, they continued to choose short-term profits over prudent lending, including by approving the Loss Loans, betting that the demand for real estate in the Bank's chosen markets would continue indefinitely.

The Loss Loans, at the time of approval, (1) increased previously criticized concentrations, (2) exceeded internal Loan Policy and/or Georgia legal lending limits, (3) violated Loan Policy and applicable laws and regulations, and/or (4) lacked proper financial analysis or verification of the creditworthiness of the

borrower and/or guarantor, and/or the value of the collateral. The inherent risks created by these improvidently granted loans were magnified when the inevitable slowdown in the real estate market began in 2006. Rather than restricting high risk lending, working out the existing troubled Loss Loans, and preserving the Bank's capital, the Defendants instead took actions that masked the Bank's mounting problems. They approved additional Loss Loans and renewed and made additional loan advances on non-performing Loss Loans, often replenishing interest reserves which allowed borrowers to pay interest with more borrowed funds. These ill-advised measures were only a temporary stop-gap, however, and the Loss Loans were not repaid resulting in over $70 million in losses to the Bank.

### The Parties

### Plaintiff

1.

Plaintiff, the FDIC, is a corporation organized and existing under the laws of the United States of America. 12 U.S.C. § 1811, et seq. The FDIC is an instrumentality of the United States of America and is charged with, among other duties, the orderly liquidation of failed banks. 12 U.S.C. § 1821(d). Integrity was a state-chartered, non-member bank under the laws of the state of Georgia, and its deposits were insured by the FDIC. On or about August 29, 2008, the Georgia

4

Department of Banking and Finance determined that Integrity was operating in an unsafe and unsound manner, and secured a court order that Integrity be closed. The same court appointed the FDIC as Receiver of Integrity, and the FDIC accepted that appointment as Receiver. Pursuant to 12 U.S.C. § 1821(d)(2)(A)(i), the FDIC as Receiver succeeded to all rights, titles, powers, and privileges of Integrity and Integrity's shareholders with respect to Integrity, including, but not limited to, Integrity's claims against the Bank's former directors and officers for negligence, gross negligence and breaches of fiduciary duty or other legal duties.

<u>Defendants</u>

2.

Defendant, Steven M. Skow ("Skow"), was the organizer and founder of Integrity and Bancshares. Skow joined the Boards of Directors and assumed the positions of President and Chief Executive Officer of the Bank and Bancshares in October 1999. Skow was a member of Bancshares' Executive Committee and also a member of the Bank's DLC. He was terminated on August 21, 2007. He resides in Alpharetta, Georgia.

3.

Defendant, Douglas G. Ballard ("Ballard"), was hired in October 2000 as Senior Vice President of the Bank's construction lending department. He was

promoted to President of the Roswell Branch in July 2002 and named the Bank's Senior Lender in February 2006. Additionally, Ballard served as the primary loan officer for most of Integrity's largest borrowing relationships. Ballard joined the Bank's Board of Directors and the DLC in May 2006 where he served until resigning his positions in September 2007, effective December 31, 2007. He resides in Alpharetta, Georgia.

4.

Defendant, Alan K. Arnold ("Arnold"), joined the Boards of Directors of the Bank and Bancshares in May 2003. Arnold was a member of Bancshares' Executive and Audit/Compliance Committees and also a member of the Bank's DLC. Arnold resigned his positions in October 2006. He resides in Alpharetta, Georgia.

5.

Defendant, Clinton M. Day ("Day"), was among the Bank's organizing directors and was elected Chairman of the Boards of Directors of the Bank and Bancshares in October 1999. Day also served as Chairman of Bancshares' Executive Committee and was a member of the Bank's DLC until resigning his positions in May 2007. He resides in St. Simons, Georgia.

6

6.

Defendant, Joseph J. Ernest ("Ernest"), joined the Boards of Directors of the Bank and Bancshares in May 2003. He was a member of DLC until resigning his positions in January 2008. Ernest resides in Norcross, Georgia.

7.

Defendant, Donald C. Hartsfield ("Hartsfield"), was an organizing director, joining the Boards of Directors of the Bank and Bancshares in October 1999. Hartsfield served as Chairman of the Bank's DLC until May 2004. He resigned his positions in February 2008. Hartsfield resides in Holmes Beach, Florida.

8.

Defendant, Jack S. Murphy ("Murphy"), joined the Boards of Directors of the Bank and Bancshares in December 2000. Murphy was a member of Bancshares' Executive and Audit/Compliance Committees and also a member of the Bank's DLC. He resigned his positions in February 2008. Murphy resides in Cumming, Georgia.

9.

Defendant, Gerald O. Reynolds ("Reynolds"), was an organizing director, joining the Boards of Directors of the Bank and Bancshares in October 1999. Reynolds was a member of Bancshares' Executive and Audit/Compliance

Committees and also a member of the Bank's DLC, serving as Chairman from May 2004 until resigning his positions in August 2008. Reynolds resides in Atlanta, Georgia.

Jurisdiction and Venue

10.

This Court has subject matter jurisdiction of this matter, as actions in which the FDIC is a party are deemed to arise under federal law pursuant to 12 U.S.C. § 1811, et seq.; 12 U.S.C. § 1819(b)(1) and (2), and 28 U.S.C. §§ 1331 and 1345. The FDIC has the power to sue and complain in any court of law. 12 U.S.C. § 1819.

11.

The Court has personal jurisdiction over the Defendants who at all relevant times were residents of, and conducted the business of Integrity in, the State of Georgia.

12.

Venue is proper in this District under 28 U.S.C. § 1391(b) as all or substantially all of the events and/or omissions giving rise to the claims asserted herein occurred in this District.

8

## Allegations of Fact Applicable to All Counts

## Integrity Lacked a True Credit Function

### 13.

Integrity was founded by Skow in November 2000. Thereafter, the Defendants presided over the very significant expansion of the Bank without implementing credit risk management policies and procedures commensurate with its rate of growth and higher risk lending practices. In August 2000, just prior to opening for business, Integrity's Board approved the Loan Policy that was in effect during all times relevant to these claims. In this policy, the Board delegated "authority and responsibility for the loan portfolio to the DLC, President, Senior Lender and Lending Officers." The DLC was specifically "charged with maintaining responsibility for the overall credit function" and was given the duty to "approve all loans and/or loan relationships in excess of $500,000."

### 14.

The Loan Policy did not require any loans to be approved by the full Board except for insider loans. However, the Loan Policy provided that the Board was to set lending limits for any individual borrowers and related entities. Although the Loan Policy acknowledged that the Georgia statutory legal lending limit is "25% of the Bank's Capital and Surplus," the Board set Integrity's limit at 35% of Tier One

9

Capital. The Loan Policy explicitly states that this internal lending limit may be exceeded only if a participating bank funds the excess. None of the Loss Loans qualify for this exception. The Georgia legal lending limit and the Bank's higher Loan Policy lending limit remained unchanged throughout Integrity's existence.

15.

Integrity's lending procedures, similarly geared to accommodate excessive growth, lacked appropriate checks and balances and rewarded irresponsible lending. The Defendants delegated virtually all of their responsibilities over Integrity's lending function to lower level loan officers. Loan officers were primarily responsible for both the loan production (sales) and quality control (credit analysis/administration) functions. The inherent conflict created by consolidating these key roles was made worse by the Bank's policy of compensating its Senior Lender and all loan officers based on the volume of loan originations/renewals, with no consideration given to the quality of the loan and/or the loan's ultimate performance. Even with the heightened potential for abuse under this flawed structure, the Defendants did not increase their involvement in the Bank's lending function.

16.

With no stake in the long-term success of the loan, loan officers focused primarily on "selling" the loan during presentations to the DLC rather than providing a complete and objective overview of the underlying factors, both good and bad, that should be considered during the loan approval process. Loan officer presentations often included stale and/or unverified financial information, inaccurate and/or incomplete collateral and project feasibility analysis, and overly optimistic risk assessments. There was also no incentive for loan officers to ensure that loans were actually closed or "booked" in accordance with all of the terms and conditions as approved by the DLC. This resulted in loan officers making significant, unapproved concessions to borrowers in order to close on more loans.

17.

All loan officers were under the direct supervision of Integrity's Senior Lender, Ballard. As the Bank's highest lending officer, Ballard was paid, in addition to his salary, 10% of the fee income generated by Integrity's lending officers from loans that were closed by the Bank. Ballard used his position as Senior Lender to further pressure loan officers to make more loans in order to increase his personal financial gain and meet the Bank's overly ambitious growth goals. The Defendants were made aware by third-party loan auditors in July 2006

that several loans had not been "booked" as approved. Further, an increasing number of questions and concerns regarding the veracity of information contained in loan presentations were discussed during the loan approval process as early as January 2006. Nevertheless, the Defendants neglected to increase their supervision of the lending function.

18.

From its November 2000 inception, the Bank concentrated its lending in higher risk, speculative (projects without committed buyers or tenants) ADC loans in the Atlanta metropolitan area and some out-of-territory markets in South Carolina and Florida. These loans were further concentrated in a small number of preferred individual borrowers to an extent that exceeded Loan Policy and Georgia legal lending limits. The DLC routinely circumvented lending limits by continuing to make loans to these preferred individual borrowers through newly formed, single purpose entities that generated cash flow only through the sale of speculative single-family residential subdivisions, condominium construction and other large-scale real estate projects.

19.

The Bank attracted residential and commercial real estate developers by offering floating rate, interest-only loans secured almost entirely by the real

estate/project being financed.  In addition, interest payments were funded almost exclusively by Bank-financed interest reserves established at origination. Theoretically, loans were to be paid off or "taken out" upon completion and sale of the financed project.  In the event loans were not taken out prior to the approved term, usually 12-24 months, the Defendants routinely approved renewals and financed additional funding for interest reserves. This lending structure required little or no borrower equity in the collateral or money out of pocket over the life of the loan, thus leaving the Bank with all of the risk if the project was not successfully completed and sold.

20.

For Integrity, in the short term, these loans, though higher in risk, generated significant interest and fee income and, because of the Bank's liberal use of interest reserves and frequent renewals, had low delinquency rates. The Defendants heavily committed the Bank to this line of lending assuming that the real estate bubble in the Bank's chosen markets would continue to expand indefinitely.  As a result, ADC loan concentration as a percentage of Tier One Capital more than doubled between 2003 and 2007. During the same time period, Integrity's total assets grew from $280 million to $1.5 billion.

13

## The Defendants Disregarded Regulatory Warnings

### 21.

State and federal regulators and Bank auditors consistently raised concerns over Integrity's excessive growth rate and repeatedly identified risks and deficiencies in Integrity's Loan Policy and lending function that continued to grow in both number and severity because of the Defendants failure to take adequate corrective measures.

### 22.

Regulators began cautioning the Defendants regarding the Bank's rapid growth rate in 2003 and 2004. The May 2003 Report of Examination ("RoE") noted "tremendous loan growth since the last examination, and... significant concentrations in ADC lending, as well as individual borrower concentrations." By the April 2005 RoE, regulators noted that the Bank's growth was outpacing its ability to maintain a well capitalized position to such an extent that the Bank had to raise $20 million in additional capital through issuance of holding company stock, primarily to existing shareholders. In fact, the Bank could not have supported its rapid growth in 2005 or 2006 without significant holding company stock issuances which raised more than $45 million in additional capital. The Defendants, nevertheless, continued to accelerate the Bank's rate of growth into 2007. Unlike

14

prior years, however, Bancshares was unable to provide supplemental funding to sustain Integrity's capital levels. Without these yearly capital injections from Bancshares, Integrity's capital declined to critically deficient levels by year-end 2007.

23.

The Bank's excessive ADC loan concentration, major lending limit violations, deficient underwriting, and negligent credit administration were among the primary risks and deficiencies identified by regulators as early as the May 2003 RoE but that continued to escalate and were noted through the June 2007 RoE.

24.

Regulators identified an increasing loan concentration in ADC lending, and noted deficiencies in the monitoring and reporting of this concentration, in the 2003 through 2007 RoEs. Integrity's Loan Policy "recognizes that concentrations of credit, if not properly monitored, [and] reported… represent an increased risk to the bank." Despite the known risks created by the lack of lending diversity and inadequate oversight, the April 2005 through June 2007 RoEs noted an increase in Integrity's ADC concentration as a percentage of Tier One Capital from 386% to 931% without a corresponding increase in monitoring and reporting.

15

25.

Excessive individual loan concentrations that resulted in significant violations of both internal Loan Policy and Georgia legal lending limits were also raised in the 2003 through 2007 RoEs. The April 2005 RoE states that "six individual borrower concentrations [together] represent 256% of Tier One Capital as of March 31, 2005." Each of the six individual concentrations exceeded Georgia legal lending limits and three exceeded the Bank's inflated 35% Loan Policy limit. Instead of taking measures to reduce, or at least limit, the Bank's aggregate exposure to certain individual borrowers in response to multiple lending limit violations and concentration risks raised in the April 2005 RoE, the Defendants continued to push for increased loan production by waiving lending limits in order to approve additional loans to these same individual concentrations.

26.

For example, the 2003 through 2006 RoE's all note that loans to Lee Najjar and his related companies exceeded 25% of Tier One Capital and were also increasing in amount. In the months following the May 2006 RoE, at a time when the legal lending limit was approximately $22.75 million, the balance actually funded to Najjar and his related companies ballooned to $40.6 million as a result of multiple lending limit waivers by the DLC. In November 2006, the DLC approved

16

two loans to Najjar entities totaling $20.1 million thereby increasing the Najjar concentration to $60.7 million – 2.66 times the legal limit.  In approving these loans, the Defendants again granted a "waiver of the lending limit" for the Najjar concentration.

27.

The DLC minutes indicate that Loan Policy and Georgia legal lending limits were affirmatively waived in connection with the approval of seven (7) of the twenty-one (21) Loss Loans.  Georgia law, however, does not provide for a waiver and in fact states that the lending limit "shall be strictly enforced." Thus, these waivers had no legal effect, but they do establish that the DLC knew that that these loans exceeded lending limits. As a result of the DLC's reckless indifference to even the Bank's inflated lending limits, regulators, in the June 2007 RoE, identified six individual borrowers that accounted for nearly one third of the Bank's total loan portfolio, with the four largest borrowers representing 289% of Tier One Capital.

28.

The increased risks created by the Bank's large ADC concentration and major lending limit violations were compounded by the Defendants' failure to implement and enforce sound policies and procedures.  The lack of checks and

17

balances in the Bank's lending procedures and inappropriate loan volume incentives lead to chronic and unremedied underwriting and administration deficiencies, including inadequate borrower/guarantor financial analysis, defective appraisals, excessive loan-to-value ratios ("LTV")(ratio of loan amount to value of collateral), untimely recognition of problem loans and improper use of loan proceeds.

29.

As the primary credit analyst, loan officers failed to adequately verify and analyze borrower/guarantor financials.  It was not uncommon for loan officers to include verbatim recitations of borrower/guarantor financial analysis in multiple loan presentations even though significant increases in borrower/guarantor liabilities had occurred in the interim.  Moreover, the April 2004 RoE found that 49% of loan files had document exceptions for financial statements, tax returns, income verification, commercial leases, and other items.  Other common underwriting deficiencies raised in the pre-2007 RoEs included: failure to perform global cash flow analysis for large individual borrowing relationships to establish a comprehensive picture of Bank debt, inaccurate and inadequately supported loan presentations, stale and/or unverified financials, inadequate analysis of

18

borrower/guarantor contingent liabilities, inadequate verification of collateral value or feasibility of speculative projects, and no clear purpose for use of loan proceeds.

30.

The true nature and extent of these underwriting deficiencies were masked by the Bank's excessive use of interest reserves. In the May 2006 RoE, regulators found that all commercial and residential ADC loans had an interest reserve component embedded into the outstanding balance of the loans and warned of the masking effect these reserves can have on a borrower's true financial condition. In mid-to-late 2006, as demand began to level off and real estate prices declined, Integrity's lending markets became saturated with speculative projects in various stages of completion, a number of which served as collateral for multi-million dollar loans already fully funded by Integrity. The Bank's individual borrower concentrations were now highly leveraged and unable to service millions of dollars of existing debt. Even after being made aware of the risks associated with interest reserves, the Defendants continued to rely heavily on them to keep loans current and carry borrowers that lacked the means to repay their debt. The Bank's over-reliance on interest reserves, however, served only to further compound the problems created by dwindling demand. The increasing principal balances caused by the continued capitalization of interest and the decreasing property values meant

the equity margin that served as Integrity's security was quickly shrinking. Moreover, interest reserves masked liquidity and delinquency problems of some borrowers by preventing the loans from becoming past due, just as regulators previously warned, which in turn prevented an accurate assessment of the quality of these loans.

31.

Loan officers were also responsible for "exercising good judgment" in overseeing the appraisal process, a process considered by Integrity's Loan Policy to be "a critical factor in the credit decision." Affording loan officers unchecked discretion lead to regulators identifying an increasing number of appraisal violations in the 2005, 2006, and 2007 RoEs. Violations noted in the April 2005 RoE included liberal and unexplained upward adjustments to comparables and use of dissimilar comparables. The Defendants took no measures to enhance oversight of the appraisal process and continued to allow loan officers motivated by volume incentives to oversee this cardinal quality control function. Consequently, at the June 2007 RoE, the list of violations had grown to include: insufficient information, engagement by the borrower, appraisals dated after loan origination, and loan officer requests for specific values.

32.

Regulators also identified policy and enforcement deficiencies regarding LTV ratios, another aspect considered critical in lending secured by real estate, in the 2004 through 2007 RoEs. Integrity's Loan Policy provided that no single maturity loan, i.e., a loan whose principal is due in total with a single payment at maturity, should exceed 75% LTV ratio. In order to satisfy this requirement, and as part of their selling the DLC on loans, loan officer presentations often included estimated LTV ratios based on the projected total future value of the collateral as opposed to current market value, a distinction not addressed in the Loan Policy. The Bank's reliance on speculative "as developed" values greatly overstated the equity cushion designed to insulate against decreasing property values. In addition, the Defendants granted exceptions to LTV ratio limits, further significantly eroding the Bank's equity cushion. Regulators noted in both the 2005 and 2006 RoE's that LTV ratio exceptions also were not documented by loan officers and/or reported to the DLC as per Loan Policy requirements. Despite their awareness of these deficiencies, the Defendants did not take corrective actions. As a result, the June 2007 RoE identified over $16 million in loans that exceeded the recommended LTV ratio that were not reported to the Board.

33.

Major shortcomings in both policy and oversight also lead to deficiencies in credit administration, which were increasingly noted in each RoE from 2003 through 2007. According to Integrity's Loan Policy, "[t]he primary responsibility for identifying problem loans rests with the account officer." Acting mostly as salesmen, loan officers frequently failed to timely recognize problem assets and were overly optimistic in their risk assessments. In fact, the June 2007 RoE ultimately downgraded 95% of the Bank's flawed loan risk ratings.

34.

The lack of credit administration controls also lead to undocumented, unexplainable or inappropriate disbursement of loan proceeds. Integrity's Loan Policy provides that "[f]unds will be disbursed after proof of inspection, verification of work." The Defendants' failure to enforce this policy, however, lead to loan proceeds deemed to be for "working capital" or "line of credit" purposes being diverted for unapproved purposes, including to fund interest payments/reserves on other loans. The Defendants were made aware in the May 2006 RoE that over $6 million in loan proceeds had been disbursed to a single borrower without prior inspection or documentation substantiating the disbursements. The Defendants still failed to take appropriate corrective measures

by implementing adequate safeguards to protect against repeat occurrences and, as one would expect, millions of dollars in disbursements unsupported by progress or proper documentation continued through the June 2007 RoE.

35.

All of the Defendants signed RoEs in 2003, 2004, 2005, 2006, and 2007, except Ballard who joined the DLC in 2006 and signed only the 2006 and 2007 RoEs, stating that they personally reviewed each RoE. Accordingly, each knew about the past regulatory criticisms and warnings and the need to take corrective actions, but they did not do so as noted in the June 2007 RoE: "Management has not provided effective oversight of the lending function. The Report is replete with weaknesses related to credit underwriting, credit approval processes, appraisal practices, loan documentation, credit administration, and problem loan recognition."

36.

The Defendants were similarly aware of the softening real estate market but did not regard it as a concern. Particular questions and comments by directors such as, "[w]e're seeing a lot of delinquent loans in housing communities, should we slow down?" and "prices have dropped in the last six months" were raised in late 2005 and early 2006. Additionally, the Defendants' declared in Bancshares'

December 31, 2006, and May 10, 2007, Securities and Exchange Commission ("SEC") filings "that the real estate market has slowed down on a nationwide basis" and acknowledged "rumors of a slumping real estate market." Rather than take prudent steps to position the Bank to survive a downturn in the real estate market, the Defendants turned a blind eye to known market risks and repeated regulatory warnings, and instead continued to increase the volume of speculative lending and individual and ADC concentrations, especially during the February 2005 through June 2007 time period relevant to Plaintiff's claims.

37.

By September 2007, nearly 80% of the Bank's total loan portfolio was concentrated in ADC loans, a concentration significantly above regulatory guidance recommendations for loan concentrations and above the Bank's own internal Loan Policy threshold. The funded loan balances for the Bank's two largest lending relationships, Lee Najjar and Paul D'Agnese, exceeded the Georgia statutory lending limit by over $42 million and $35 million, respectively. The aggregate amount of all loans in excess of applicable supervisory LTV limits had grown to 227% by year-end 2007, more than twice the amount allowed. The nature and extent of abuses by inadequately supervised loan officers had also increased.

38.

By the time the Defendants received the 2007 RoE, the die was cast for the ultimate collapse of Integrity. Only then did the Defendants begin to implement the corrective measures urged for years by regulators and auditors. The Defendants finally took action with respect to limiting the Bank's maximum exposure to one borrower, improving oversight of large borrowing relationships, improving the accuracy and completeness of loan presentations, and limiting use of interest reserves. It was too little, too late, however, and the years of excess risk taking and lack of oversight by the Defendants that fueled Integrity's astronomical growth ultimately lead to its failure on August 29, 2008. As admitted by Skow, "Our overwhelming success up to [mid-2006] became intoxicating and we shifted some of our focus from asset quality to earnings and growth which was a mistake… [t]his shift in our focus also created gaps in the enforcement of Bank policies and procedures. In other words, we became lax on having our checker checking the checker."

## Approval of Loss Loans

### 39.

The Loss Loans were approved by the DLC between February 2005 and May 2007.  Each loan and its associated losses are included in the chart below and described in further detail in the paragraphs that follow:

| BORROWER | ORIGINATION | LOAN AMOUNT | CURRENT LOSSES |
|---|---|---|---|
| Q4 Industries | June 2, 2005 | $2,850,000 | $2,850,000 |
| Diversified Executive Crestview | July 19, 2005 | $10,300,000 | $3,808,846 |
| LN Watertank Grove | May 25, 2006 | $562,000 | $510,000 |
| Fischer Crossing Development | November 14, 2006 | $8,270,000 | $5,556,736 |
| Chrisley Family Trust | November 17, 2006 | $10,000,000 | $9,993,468 |
| LN Financial | November 20, 2006 | $19,200,000 | $7,092,569 |
| LKC, LLC | December 7, 2006 | $1,500,000 | $1,292,094 |
| LN Citrus Grove | December 28, 2006 | $2,900,000 | $2,666,875 |
| LN Financial | December 28, 2006 | $1,800,000 | $606,058 |
| LN Groveland | February 21, 2007 | $1,275,000 | $1,261,832 |
| Triple N Co., Inc. | April 17, 2007 | $2,500,000 | $600,000 |
| Deepwater Holdings | May 2, 2007 | $6,930,000 | $1,034,540 |
| Diversified Executive Crestview | February 4, 2005<br>December 14, 2005<br>February 14, 2007 | $1,088,000<br>$1,000,000<br>$1,000,000 | $2,705,568 |
| Diversified Executive Myrtle Beach | July 29, 2005<br>February 2, 2006<br>February 14, 2007 | $8,500,000<br>$11,000,000<br>$4,600,000 | $22,214,384 |
| Urban Blu, LLC | August 24, 2005<br>October 24, 2005<br>January 24, 2007 | $13,000,000<br>$1,700,000<br>$2,500,000 | $10,040,313 |

40.

## Q4 Industries - 400550400

The DLC approved a $2,850,000 loan to Lawrenceville Transfer Facility ("LTF") on May 25, 2005, although Q4 Industries, L.L.C. was listed as the borrower in Integrity's system. Q4 Industries was a new entity formed just 2 months prior to the approval date and was not included in the loan presentation. The stated purpose of the loan was to "refinance investor notes." The primary repayment source was cash flow from LTF's waste transfer facility. The loan was secured by LTF's interest in a 19 year commercial leasehold estate having an "as is" appraised value of $1.1 million and an "as stabilized" appraised value of $4.1 million. Two individual guarantors also pledged a second mortgage on their residences as additional collateral. Contrary to the loan presentation, however, Integrity never held a tandem interest in the two collateral offerings which left the Bank in an under secured position.

41.

Other deficiencies and violations identified on the Q4 Industries loan included: (1) inaccurate and incomplete loan presentation – identity of actual borrower not disclosed; (2) borrower/guarantors lacked financial wherewithal to

service the loan – LTF's net monthly income of $12,430 was patently insufficient to meet $16,625 monthly debt service; (3) interest reserve funded by subsequent loan to a borrower-related entity; (4) defective appraisal – borrower provided projections; (5) "as is" LTV ratio of 259%; (6) failure to secure/perfect Bank's interest in collateral – assignment of LTF's interest in leasehold to the Bank was executed nearly 5 months after origination; and (7) unauthorized partial release of collateral – mortgages on the guarantors' residences pledged as additional security were released upon the execution of the leasehold assignment.

42.

The Q4 Industries loan was placed into default after the $350,000 interest reserve established at origination was exhausted in or around May 2007. By this time, the guarantors provided no source of recovery and the interest in the collateral securing the loan had either been released or was invalid. This loan was charged-off in its entirety on June 29, 2007. Losses suffered by Integrity as a result of the DLC's approval and subsequent mismanagement of this loan are approximately $2,850,000.

43.

### Diversified Executive Crestview - 400496100

The DLC approved a $1,088,000 loan to Diversified Executive Crestview, an entity owned and/or controlled by Paul D'Agnese, on January 5, 2005. The stated purpose of the loan was to refinance 302 acres located in Crestview, Florida, which had been recently appraised at $1.675 million. Courthouse records, however, show D'Agnese purchased the property one month after this appraisal for only $1.080 million.

44.

Other deficiencies and violations identified on this loan included: (1) circumvention of Georgia legal lending limit; (2) highly leveraged borrower/guarantor lacking financial wherewithal to service loan; (3) inaccurate and inadequately supported loan presentation – Ballard reported the purchase price of the property to be $1.5 million when the actual price paid was only $1.080; (4) defective appraisal – significant and unsupported upward adjustment of comparables; (5) LTV ratio of 101% based on actual cost of real estate; and (6) excessive use of interest reserves on speculative project.

45.

## Diversified Executive Crestview - 400496100

The DLC approved a $1,000,000 increase to Diversified Executive Crestview on December 14, 2005. The stated purpose of the loan was a temporary line of credit. The loan was secured by the same undeveloped 302 acre tract in Crestview, Florida, which according to Ballard, was now valued at $8.8 million. Conspicuously absent from Ballard's loan presentation, however, was an explanation for the astonishing $7 million increase in value in just 12 months.

46.

Other deficiencies and violations identified on this loan included: (1) affirmative waiver of Integrity Loan Policy and Georgia legal lending limits; (2) inaccurate and inadequately supported loan presentation; (3) highly leveraged borrower/guarantor lacking financial wherewithal to service loan; (4) undocumented, unexplainable and inappropriate disbursement of loan proceeds – diverted to fund interest payments on a separate loan to Diversified Executive Crestview described in paragraphs 49 and 50 below; (5) defective appraisal – contained insufficient information to support the credit decision; (6) out of territory collateral; and (7) excessive use of interest reserves on speculative project.

47.

## Diversified Executive Crestview - 400496100

The DLC approved another $1,000,000 increase to Diversified Executive Crestview on February 1, 2006.  The stated purpose of the loan was a temporary line of credit secured by the still undeveloped 302 acre tract in Crestview, Florida. The property was purportedly under contract for $4.8 million, which is significantly lower than the claimed $8.8 million appraised value. The DLC did not independently verify the existence of the purchase contract and the Crestview property was never purchased.

48.

Other deficiencies and violations identified on this loan included: (1) second affirmative waiver of Integrity Loan Policy and Georgia legal lending limits; (2) inaccurate and inadequately supported loan presentation; (3) highly leveraged borrower/guarantor lacking financial wherewithal to service loan; (4) undocumented, unexplainable and inappropriate disbursement of loan proceeds – diverted to fund interest payments on a separate loan to Diversified Executive Crestview described in paragraphs 49 and 50 below; (5) out of territory collateral; and (6) excessive use of interest reserves on speculative project.  To date, losses suffered by Integrity as a result of the DLC's approval and subsequent

mismanagement of the Diversified Executive Crestview loans described in paragraphs 43 through 48 are approximately $2,705,568.

49.

### Diversified Executive Crestview - 400705800

The DLC approved a $10,300,000 loan to Diversified Executive Crestview on July 13, 2005. The stated purpose of the loan was to fund the purchase and development of a speculative 27 unit condominium project on 1.84 acres in Eastpoint, Florida. The primary source of repayment was to come from the sale of the condominium units. The loan was secured by the acreage and planned improvements which had an "as is" appraised value of $5.7 million and a discounted "as complete" appraised value of $13.8 million.

50.

Deficiencies and violations identified on the this loan included: (1) circumvention of Georgia legal lending limit; (2) highly leveraged borrower/guarantor lacking financial wherewithal to service loan; (3) inaccurate and inadequately supported loan presentation – Ballard reported presale figures to be 85% when only 30% had been presold; (4) "as is" LTV ratio of 180%; (5) out of territory collateral; and (6) excessive use of interest reserves on speculative project.

To date, losses suffered by Integrity as a result of the DLC's approval and subsequent mismanagement of this loan are approximately $3,808,846.

51.

## Diversified Executive Myrtle Beach - 400581000

The DLC approved an $8,500,000 loan to Diversified Executive Myrtle Beach, an entity owned and/or controlled by Paul D'Agnese, on July 27, 2005. The stated purpose of the loan was to fund the acquisition and speculative development of 1,310 water front condominiums on 55 acres in Myrtle Beach, South Carolina. The primary source of repayment was resale of the land to a developer. The loan was secured by the acreage which had an appraised value of $11.3 million.

52.

Deficiencies and violations identified on the this loan included: (1) affirmative waiver of Integrity's Loan Policy and Georgia legal lending limit; (2) highly leveraged borrower/guarantor lacking financial wherewithal to service loan; (3) inaccurate and inadequately supported loan presentation; (4) out of territory collateral; and (5) excessive use of interest reserves on speculative project.

53.

## Diversified Executive Myrtle Beach - 400581000

The DLC approved an $11,000,000 increase to Diversified Executive Myrtle Beach on February 1, 2006. The stated purpose of the loan was a "line of credit" to fund the buy-out of an investor. The loan was secured by the same 55 acres, now reported to have an estimated "as is" value of $30 million. The loan proceeds were supposed to be placed into escrow until the closing of the investor buy-out transaction. However, Ballard later confirmed to regulators that the loan proceeds were instead disbursed to the borrower at the closing and he could not confirm whether the buy-out even took place.

54.

Other deficiencies and violations identified on the this loan included: (1) inadequate analysis of borrower/guarantor financials and creditworthiness relative to the size of the relationship; (2) highly leveraged borrower/guarantor lacking financial wherewithal to service loan; (3) second affirmative waiver of Loan Policy and Georgia legal lending limits; (4) defective appraisal – relied too heavily on future rezoning; (5) out of territory collateral; (6) undocumented, unexplainable and inappropriate disbursement of loan proceeds; and (7) excessive use of interest

reserves on speculative project – additional $1.5 million of the increase went to replenish interest reserve.

## 55.

### Diversified Executive Myrtle Beach - 400581000

The DLC approved another $4,600,000 increase to Diversified Executive Myrtle Beach on February 14, 2007. The stated purpose of the loan was a "line of credit" to fund the borrower's "recouping some of the costs of entitlement," though the nature and extent of these costs were not discussed. This loan was secured by the same 55 acre tract which had now purportedly increased in value to $51 million. The DLC approved this increase even after being informed by external loan auditors that D'Agnese was so highly leveraged that he was incapable financially to service his loans without interest reserves.

## 56.

Other deficiencies and violations identified on the this loan included: (1) inadequate analysis and verification of borrower/guarantor financials relative to the size of the relationship; (2) highly leveraged borrower/guarantor lacking financial wherewithal to service loan; (3) third affirmative waiver of Integrity's Loan Policy and Georgia legal lending limits; (4) inaccurate and incomplete loan presentation – Ballard failed to advise that $2.2 million was going to fund interest reserves and

inaccurately reported that D'Agnese "has an excellent net worth with sufficient liquidity to carry the project outside the interest reserve;" (4) undocumented and unexplainable disbursement of loan proceeds; and (5) excessive use of interest reserves on speculative project. To date, losses suffered by Integrity as a result of the DLC's approval and subsequent mismanagement of the Diversified Executive Myrtle Beach loans described in paragraphs 51 through 56 are approximately $22,214,384.

57.

<u>LN Watertank Grove - 400775800</u>

The DLC approved a $562,000 loan to LN Watertank Grove, an entity owned and/or controlled by Lee Najjar, on May 10, 2006. The stated purpose of the loan was to acquire 40 acres of land in Polk County, Florida. The primary payment source was the sale of the collateral. The loan was secured by the acreage which had an estimated, yet unverified, value of $800,000.

58.

Deficiencies and violations identified on this loan included: (1) inadequate analysis of borrower/guarantor financials and creditworthiness relative to the size of the relationship; (2) highly leveraged borrower/guarantor lacking financial wherewithal to service loan; (3) affirmative waiver of Loan Policy and Georgia

36

legal lending limits; and (4) excessive use of interest reserves on speculative project. To date, losses suffered by Integrity as a result of the DLC's approval and subsequent mismanagement of this loan are approximately $510,125.

59.

## LN Financial - 400841800

The DLC approved a $19,200,000 loan to LN Financial, an entity owned and/or controlled by Lee Najjar, on November 15, 2006. The stated purpose of the loan was "financing of corporate assets concentrated in real estate." The primary source of repayment was the rental income from tenants of Najjar's real estate portfolio, which Ballard estimated to be valued at $223 million.

60.

Deficiencies and violations identified on this loan included: (1) inadequate analysis and verification of borrower/guarantor financials relative to the size of the relationship; (2) highly leveraged borrower/guarantor lacking financial wherewithal to service loan; (3) affirmative waiver of Loan Policy and Georgia legal lending limits; (4) inaccurate and inadequate loan presentation – loan proceeds were actually used to purchase the defaulted loans of another Integrity borrower; (5) use of interest reserves on loan secured by income producing property; (6) failure to secure/perfect interest in collateral; and (7) undocumented,

unexplainable and inappropriate disbursement of loan proceeds. To date, losses suffered by Integrity as a result of the DLC's approval and subsequent mismanagement of this loan are approximately $7,776,721.

61.

LN Financial - 400858600
LN Citrus Grove - 400858800

The DLC approved a $4,700,000 loan to Lee Najjar, individually, on December 20, 2006. The stated purpose of the loan was a "working capital line of credit." The loan was also secured by the rental income from tenants of Najjar's real estate portfolio, which Ballard estimated to be valued at $223 million, with net a annual operating income of $20.4 million. According to Bank records, the proceeds of this loan were subsequently split between two Najjar entities, with $1,800,000 going to LN Financial and $2,900,000 going to LN Citrus Grove, although neither entity was mentioned in the loan presentation.

62.

Other deficiencies and violations identified on this loan included: (1) inadequate analysis and verification of borrower/guarantor financials relative to the size of the relationship – analysis did not include the $19.2 million loan to LN Financial; (2) highly leveraged borrower/guarantor lacking financial wherewithal to service loan; (3) circumvention of Loan Policy and Georgia legal lending limits;

38

(3) inaccurate and inadequate loan presentation – actual borrowers not disclosed; (4) failure to perfect Integrity's interest in the collateral; and (5) undocumented, unexplainable and inappropriate disbursement of loan proceeds – funded interest on prior loan to LN Financial described in paragraphs 59 through 60 above. To date, losses suffered by Integrity as a result of the DLC's approval and subsequent mismanagement of this loan are approximately $3,272,933.

63.

### LN Groveland - 400879800

The DLC approved a $1,275,000 loan to LN Groveland, an entity owned and/or controlled by Lee Najjar, on February 21, 2007. The stated purpose of the loan was to acquire 9.22 acres of improved land in Groveland, Florida. The primary repayment source was the sale of the real estate acquired with the loan proceeds. The loan was secured by the acreage which Ballard estimated to be valued at $1.7 million.

64.

Deficiencies and violations identified on this loan included: (1) inadequate analysis and verification of borrower/guarantor financials relative to the size of the relationship – Najjar financials were not updated to reflect substantial increase in liabilities resulting from guarantees of previous loans; (2) highly leveraged

borrower/guarantor lacking financial wherewithal to service loan; (3) circumvention of Loan Policy and Georgia legal lending limits; and (4) inaccurate and inadequate loan presentation. To date, losses suffered by Integrity as a result of the DLC's approval and subsequent mismanagement of this loan are approximately $1,261,832.

65.

### Triple N, Inc. - 400822800

The DLC approved a $2,500,000 loan to Triple N, Inc., an entity owned and/or controlled by Lee Najjar, on April 4, 2007. The stated purpose of the loan was to fund the acquisition of a shopping center in Moultrie, Georgia. The loan was secured by a 149,423 square foot retail center valued at $3.5 million. The primary repayment source for the loan was the retail center's monthly cash flow which Ballard reported was approximately $350,000 per year.

66.

Deficiencies and violations identified on this loan included: (1) inadequate analysis and verification of borrower/guarantor financials relative to the size of the relationship - Najjar financials were not updated to reflect substantial increase in liabilities resulting from guarantees of previous loans; (2) highly leveraged borrower/guarantor lacking financial wherewithal to service loan; (3)

40

circumvention of Loan Policy and Georgia legal lending limits; and (4) use of interest reserves on loan secured by income producing property. To date, losses suffered by Integrity as a result of the DLC's approval and subsequent mismanagement of this loan are approximately $1,261,832.

67.

Fischer Crossing Development - 400841600

The DLC approved a $8,270,000 loan to Fischer Crossing Development on November 1, 2006. The stated purpose of the loan was to fund acquisition and speculative development of a 30 +/- acre site in Coweta County, Georgia. The primary source of repayment was the sale of completed retail parcels. The loan was secured by the acreage and planned improvements, which had an "as is" appraised value of $6.7 million and an "as developed" appraised value of $11.3 million.

68.

Deficiencies and violations identified on this loan included: (1) inadequate analysis of borrower/guarantor financials and creditworthiness relative to the size of the loan; (2) highly leveraged borrower/guarantor lacking financial wherewithal to service loan; (3) inaccurate and incomplete loan presentation; (4) defective appraisal – found to be rife with violations and entirely inconsistent with generally accepted appraisal practices; (5) "as is" LTV ratio of 123%; and (6) excessive use

41

of interest reserves on speculative project. To date, losses suffered by Integrity as a result of the DLC's approval and subsequent mismanagement of this loan are approximately $6,092,571.

69.

Chrisley Family Trust - 400417000

The DLC approved a $10,000,000 loan to the Chrisley Family Trust, an entity controlled by Michael Chrisley, on October 18, 2006. The stated purpose of the loan was a line of credit for "real estate investments." The loan was secured by two residential homes in Atlanta with a combined appraised value of $17 million. According to Ballard, the loan would be repaid from the sale of one of the homes which purportedly was under a letter of intent.

70.

Deficiencies and violations identified on this loan included: (1) inadequate analysis and verification of borrower/guarantor financials and collateral - $8 million in superior liens on collateral not included in analysis; (2) inaccurate and incomplete loan presentation; (3) LTV ratio of 111% if superior liens were considered; and (4) appraisal first reviewed after origination. To date, losses suffered by Integrity as a result of the DLC's approval and subsequent mismanagement of this loan are approximately $9,993,468.

42

71.

<u>LKC, LLC - 400848200</u>

The DLC approved a $1,500,000 loan to LKC, L.L.C., an entity owned and/or controlled by Michael Chrisley, on December 6, 2006. The stated purpose of the loan was unclear.  The purpose stated in the loan memorandum was "real estate investments" while the accompanying written narrative stated the loan was a revolving line of credit for "working capital."  The loan was unsecured.

72.

Other deficiencies and violations identified on this loan included: (1) inadequate analysis and verification of borrower/guarantor financials relative to the size of the relationship - failed to verify liquidity in connection with unsecured loan and financials did not reflect substantial increase in guarantor liabilities resulting from guarantee of the Chrisley Trust loan described in paragraphs 69 through 70 above; (2) inaccurate and inadequate loan presentation; and (3) multiple Loan Policy violations with respect to unsecured loans. To date, losses suffered by Integrity as a result of the DLC's approval and subsequent mismanagement of this loan are approximately $1,292,094.

73.

Deep Water Holdings - 400926800

The DLC approved a $6,930,000 loan to Deep Water Holdings on May 2, 2007. The stated purpose of the loan was to fund the acquisition and speculative development of single family residences and town homes on a 372 +\- site in Liberty County, Georgia. The primary repayment source was listed as proceeds from the closing of a development loan. The loan was secured by the acreage which the loan presentation valued at $11.3 million.

74.

Deficiencies and violations identified on this loan included: (1) inadequate analysis and verification of borrower/guarantor financials relative to the size of the loan; (2) circumvention of Loan Policy and Georgia legal lending limits; (3) appraisal first reviewed after origination; and (4) excessive use of interest reserves on a speculative project.  This loan was charged off by the Bank on August 29, 2008. The losses suffered by Integrity as a result of the DLC's approval and subsequent mismanagement of this loan are approximately $1,034,540.

75.

Urban Blu, L.L.C. - 400597000

The DLC approved a $13,000,000 loan to Urban Blu, L.L.C., an entity owned and/or controlled by Kenneth Minchew, on June 1, 2005. The stated purpose of the loan was to purchase 34 acres and fund initial development costs for a speculative condominium project in Panama City Beach, Florida. Deficiencies and violations identified on the this loan included: (1) inadequate analysis and verification of borrower/guarantor financials relative to the size of the relationship; (2) inaccurate and incomplete loan presentation; (3) failure to ensure borrower made required $ 1 million equity contribution; and (4) excessive use of interest reserves on speculative project.

76.

Urban Blu, L.L.C. - 400597000

The DLC approved a $1,700,000 increase to Urban Blu, L.L.C., on October 21, 2005.  The stated purpose of the loan was to purchase 6 acres adjacent to the recently purchased 34 acres in Panama City Beach, Florida. Deficiencies and violations identified on the this loan included: (1) circumvention of Integrity's Loan Policy and Georgia legal lending limits; (2) inadequate analysis and verification of borrower/guarantor financials relative to the size of the relationship;

45

(3) inaccurate and incomplete loan presentation; and (4) excessive use of interest reserves on speculative project.

77.

Urban Blu, L.L.C. - 400597000

The DLC approved a $2,500,000 increase to Urban Blu, L.L.C., on February 21, 2007. The stated purpose of the loan was "working capital." Regulators discovered during the June 2007 examination that the closing and funding of this loan took place nearly a month before it was approved by the DLC.  Further, the DLC approved and funded a total of approximately $17.2 million in loans to Urban Blu to fund the purchase of real estate costing $11.8 million.

78.

Other deficiencies and violations identified on the this loan included: (1) inadequate analysis and verification of borrower/guarantor financials relative to the size of the relationship; (2) inaccurate and incomplete loan presentation – proceeds were used to fund interest reserve; (3) undocumented and unexplainable disbursement of loan proceeds; and (4) excessive use of interest reserves on speculative project. To date, losses suffered by Integrity as a result of the DLC's approval and subsequent mismanagement of the Urban Blu loans described in paragraphs 75 through 78 are approximately $12,214,384.

46

79.

The DLC approved all of the Loss Loans on the merits. As DLC members the Defendants were functioning effectively as officers executing policy decisions made by the Board and were required to do so in compliance with all applicable laws, regulations and Integrity's Loan Policy. A reasonably prudent person, in the face of regulatory warnings and a softening real estate market, would not have proceeded with "business as usual" in approving the Loss Loans given their significant deficiencies. A prudent DLC member either would have voted not to approve the Loss Loans or would have taken action to protect the Bank from the associated risks before voting to approve them.

## CLAIMS FOR RELIEF

## COUNT I

### Negligence and Gross Negligence

80.

The allegations of Paragraphs 1 through 79 of this Complaint are incorporated herein by reference.

81.

As directors and/or officers of Integrity, the Defendants owed a duty of care and diligence and fair dealing in the management, conduct and direction of the

47

business of Integrity.  The Defendants duties included, but were not limited to, the

following:

   a.   To manage, conduct and direct the business and affairs of Integrity in accordance with and to ensure compliance with applicable laws, regulations, bylaws, policies, and sound and prudent banking practices;

   b.   To exercise reasonable control and supervision over the officers and employees of Integrity;

   c.   To maintain a proper division of authority and responsibility among the officers of Integrity to prevent the dominance of any officer in the conduct of the business and affairs of Integrity;

   d.   To review carefully each report of examination of Integrity's affairs as made by the regulatory authorities and to carry out the directions and instructions contained in such reports of examination and to establish and maintain procedures to ensure no recurrence of any deficiencies set forth therein;

   e.   To attend the regular meetings of the directors and the DLC and actively to review and approve or disapprove each loan and/or investment;

   f.   To take such action as necessary to ensure that Integrity's loans and investments were underwritten, approved, disbursed and collected in accordance with the law, regulations, bylaws and policies applicable thereto and in accordance with sound and prudent banking practices;

   g.   To take such action as necessary to ensure that the officers, employees, and agents of the institution complied with the instructions and directions of the Board and DLC;

   h.   To exercise independent judgment in the best interest of Integrity in the conduct of its business and affairs and to avoid conflicts of interest;

i.     To ensure that Integrity did not engage in any unsafe or unsound practices; and

j.     To perform faithfully and diligently their duties as members of Integrity's Board committees.

82.

In disregard of their duties to Integrity, the Defendants failed to exercise that degree of diligence, care, judgment, skill and good faith which ordinarily prudent persons would have exercised under similar circumstances in like positions in managing, conducting, supervising and directing Integrity's making, supervising and administering of loans. The Defendants failures to exercise reasonable care, skill, diligence, loyalty and good faith in the discharge of their responsibilities include, but are not limited to, the following acts and omissions:

a.     Failed to inform themselves and each other of the true condition of the assets and liabilities of Integrity and the nature of its loan portfolio, or to review and inquire adequately into Integrity's loan transactions;

b.     Failed to establish or adhere to adequate policies and procedures prescribing the conditions and limitations under which loans could be made and the underwriting and record-keeping which should be undertaken on loans, resulting in hazardous lending;

c.     Caused or permitted approval of loans with excessive LTV ratios and/or deficient or incomplete appraisals;

d.     Failed to establish or adhere to policies responsive to the numerous and repeated warnings and criticisms of federal and state banking authorities and regulators;

49

e.    Failed to inform themselves and each other of the nature, viability, legality and prudence of loans presented for their review, analysis, approval or ratification;

f.    Failed to establish and maintain an Allowance for Loan and Lease Losses ("ALLL") consistent with Integrity's high risk lending practices;

g.    Failed to maintain or require and supervise the maintenance of adequate loan documentation;

h.    Failed to exercise independent judgment and to act in the best interest of Integrity in entering, approving, and ratifying loans;

i.    Failed to exercise due diligence and care in the supervision of Integrity's officers and employees in the discharge of their duties;

j.    Violated or permitted violation of prudent banking practices by making or permitting loans in which the sale or liquidation of collateral security was the only method by which the loan could be repaid;

k.    Caused or permitted loans to be made to borrowers who were known or should have been known to be poor credit risks, or who were in obvious financial difficulty;

l.    Caused or permitted loans to be made on the basis of grossly inadequate or inaccurate information regarding the finances of the borrower, the value of the collateral, and/or the sources of repayment;

m.    Caused or permitted loans to be made on an under-secured basis, contrary to prudent banking practice;

n.    Caused or permitted the making and renewal of loans to borrowers or related groups of borrowers which resulted in the creation of imprudent concentrations of credit;

o.   Caused or permitted the approval and renewal of loans in excess of Georgia statutory and/or Integrity Loan Policy lending limits to one borrower;

p.   Failed to make or cause to be made appropriate investigations into borrowers' creditworthiness, representations of values contained in the borrowers' financial statements, and the actual value of collateral given to secure loans;

q.   Caused or permitted loans to be made to borrowers or their related interests after loans made previously to these borrowers had already become nonperforming, were in default, or were classified by regulatory authorities;

r.   Failed to properly supervise loan disbursals; and

s.   Caused or permitted in excess of 100% financing for speculative ventures.

83.

Plaintiff further shows that the acts and omissions of the Defendants were so imprudent, reckless and careless as to amount to gross negligence on the part of the Defendants.

84.

As a direct and proximate result of the foregoing and other breaches, acts and omissions of the Defendants, Integrity suffered serious financial losses in excess of $70 million on at least twenty-one (21) loans or groups of loans or transactions, referred to herein as the Loss Loans.

51

85.

Pursuant to provisions of applicable Georgia and federal laws, Plaintiff is entitled to recover from the Defendants all damages sustained as a result of the negligence and gross negligence alleged herein.

## COUNT II

### Breach of Fiduciary Duties

86.

The allegations of Paragraphs 1 through 85 of this Complaint are incorporated herein by reference.

87.

Pursuant to applicable federal statutes, regulations and Georgia law, directors and officers of insured financial institutions, such as Integrity, stand in a fiduciary relationship to the institutions they serve, and the depositors and shareholders thereof, and are obligated to discharge the duties of their respective positions in accordance with the standards imposed by those laws.

88.

The Defendants owed fiduciary duties, individually and collectively, to exercise the highest degree of loyalty, care, diligence and fair dealing in the management, conduct and direction of the business of Integrity. The Defendants'

duties included, but were not limited to, those set forth in Paragraph 81 of this Complaint.

89.

In addition, the Defendants, individually and collectively, owed to Integrity, and its depositors and shareholders, a duty to exercise due care and diligence in the management and administration of Integrity's affairs, and were deemed to stand in a fiduciary relation to Integrity, and were required to discharge their duties with the utmost good faith and with the diligence, care, judgment and skill which ordinarily prudent persons would exercise under similar circumstances in like positions.

90.

The Defendants, individually and collectively, breached their fiduciary duties to Integrity, and its depositors and shareholders, by not discharging their duties in good faith, and by failing to exercise that degree of diligence, care, loyalty, judgment and skill required of them in the conduct, direction, supervision and control of Integrity's business and affairs. The Defendants committed or permitted acts and omissions which resulted in severe damage to Integrity, including, but not limited to, those acts and omissions listed in Paragraphs 83 and 84 of this Complaint.

91.

As a direct and proximate result of the breaches of fiduciary duty by the Defendants, Integrity sustained losses in excess of $70 million.

92.

Pursuant to provisions of applicable law, Plaintiff is entitled to recover from the Defendants all damages sustained as a result of the breaches of fiduciary duty alleged herein.

WHEREFORE, on Count I of its Complaint, Plaintiff prays for judgment jointly, severally and in solido against the Defendants for compensatory damages occasioned by their negligence and gross negligence in an amount in excess of $70 million, plus interest thereon and costs; and

On Count II of its Complaint, Plaintiff prays for judgment jointly, severally and in solido against the Defendants for compensatory damages occasioned by their breaches of fiduciary duty in an amount in excess of $70 million, plus interest thereon and costs; and

Plaintiff further prays for trial by jury and for all other legal and equitable relief to which it may show itself justly entitled.

Respectfully submitted this 14th day of January, 2011.

Jeanne Simkins Hollis
Georgia Bar No. 646890
Christopher D. Balch
Georgia Bar No. 034015
**Simkins Hollis Law Group, P.C.**
1924 Lenox Road, NE
Atlanta, Georgia 30306
Phone: (404) 474-2328
Fax: (770) 587-0726
jshollis@shlglaw.com
cbalch@shlglaw.com

Kyle M. Keegan
Louisiana Bar No. 19942
Chris D. Kiesel
Louisiana Bar No. 26360
Dustin R. Bagwell
Louisiana Bar No. 27366
**Keegan, DeNicola, Kiesel, Bagwell,**
**Juban & Lowe, LLC**
5555 Hilton Ave., Suite 205
Baton Rouge, Louisiana 70808
Phone: (225) 364-3600
Fax: (225) 364-3608
kmk@keegandenicola.com
cdk@keegandenicola.com
drb@keegandenicola.com

Counsel for the FDIC as Receiver of
Integrity Bank of Alpharetta, Georgia

55

## LR 7.1 CERTIFICATE

Pursuant to L.R. 7.1D, counsel certifies that the foregoing Complaint complies with the font and point selections approved by the Court in L.R. 5.1.B. This Complaint was prepared using Times New Roman font, 14-point.

Christopher D. Balch
Simkins Hollis Law Group, P.C.

Counsel for Plaintiff